CONCERNED CITIZENS OF
BRIDESBURG, et al.

v.

CITY OF PHILADELPHIA, et al.

Civ. A. No. 85–14.

United States District Court,
E.D. Pennsylvania.

July 25, 1986.

Jerome Balter, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for plaintiffs.

Environmental Protection Agency, Philadelphia, Pa., Robt. J. Smolski, James Sheehan, Asst. U.S. Atty., Michael W. Steinberg, Asst. Chief, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Bradford F. Whitman, Ellen Guerin, Philadelphia, Pa., for Rohm & Haas Co. and Allied Corp.

Denise D. Colliers, Deputy City Sol., Philadelphia, Pa., for defendants.

OPINION AND ORDER

VanARTSDALEN, Senior District Judge.

*Findings of Fact*

*The Northeast Water Pollution Control Plant*

1. The Northeast Water Pollution Control Plant (Northeast Plant) is located on a

roughly square tract of land, containing approximately forty-five acres. The main entrance is at the intersection of Wheatsheaf Lane and Richmond Street in the so-called Bridesburg area of the City of Philadelphia, Pennsylvania. The Northeast Plant is situated a short distance south of the Betsy Ross Bridge, and is generally east of U.S. Route I-95, extending from Richmond Street southeastwardly to Delaware Avenue between Castor Avenue and Lewis Street.

2. The neighborhood surrounding the Northeast Plant contains a mixture of residential, commercial and industrial land uses. The intervenor-defendants, Rohm and Haas Company and Allied Corporation, both own and operate large industrial chemical manufacturing plants in close proximity. There are also other industries in the vicinity, including a smelting plant and a rendering plant. Most of the individual plaintiffs are residents of the neighborhood.

3. The Northeast Plant is a sewage treatment and disposal plant. Its primary function is to process the liquid wastes from the sewer systems of the northeastern areas of Philadelphia. It also receives influent from some sewer systems serving areas of Bucks and Montgomery counties. Its daily influent includes both storm sewer and sanitary sewer liquid wastes. Both of the intervenor-defendants discharge industrial liquid wastes into sewers that carry the sewage to the Northeast Plant.

4. The present plant capacity can process 210 million gallons per day. The industrial wastes processed by the Northeast Plant constitute approximately seven percent of the normal total dry weather flow of influent. The plant's total capacity is adequate for all present and reasonably foreseeable future uses.

5. The Northeast Plant has operated as a sewage treatment and disposal plant continuously since at least 1923. In the early 1950's the plant underwent substantial renovations. As the result of extensive litigation commenced in 1978 involving the City of Philadelphia, the Environmental Protec-

tion Agency, the Delaware River Basin Commission and various other entities and individuals, a consent decree was filed on May 30, 1979 and approved by Hon. J. William Ditter, Jr., of this court on September 21, 1979. The decree required extensive reconstruction and upgrading of the facilities of the Northeast Plant in order to comply with various standards, primarily involving the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, as to the effluent that was being discharged by the Northeast Plant into the Delaware River. The capital expenditures by the City of Philadelphia in carrying out the renovations have exceeded Three Hundred Million Dollars. As of the time of the trial of the present case, most of the planned reconstruction was completed, and the renovated system was in operation. Certain malfunctioning equipment remained to be corrected and some additional processing equipment had yet to be installed and tested.

6. The Northeast Plant is one of three sewage treatment and disposal plants located in the City of Philadelphia. These plants are all under the operation and control of the Water Department of the City of Philadelphia.

*Procedural Background of the Case*

7. The plaintiffs consist of a nonprofit corporation, Concerned Citizens of Bridesburg, and a group of approximately 130 individuals. The individual plaintiffs all live in the vicinity of the Northeast Plant and allege injury and harm from malodors being emitted from the Northeast Plant. Concerned Citizens of Bridesburg is incorporated under the laws of Pennsylvania and its members are residents of the Bridesburg area of Philadelphia. The complaint was filed on January 3, 1985. Plaintiffs seek to enjoin defendants from operating the Northeast Plant "in violation of the Clean Air Act, 42 U.S.C. § 7401 et seq." The sole alleged claim for federal jurisdiction is the "citizen lawsuit provision of the Clean Air Act, 42 U.S.C. § 7604 and 28 U.S.C. § 1331." Neither the complaint nor the amended complaint (filed April 12, 1985) expressly assert a claim based on any

other federal statute, nor on the basis of any violation of state statutory or common law, and there is no request contained in the complaint or amended complaint that the court hear or determine any state claim on the basis of pendent jurisdiction. The relief sought is solely equitable injunctive relief.

8. As required by the Clean Air Act, 42 U.S.C. § 7410, Pennsylvania adopted, and the Administrator of the United States Environmental Protection Agency (EPA) approved, a State Implementation Plan (SIP). The Pennsylvania SIP, as approved (40 C.F.R. § 52.2020), incorporated the Pennsylvania Air Pollution Control Act, 35 P.S. § 4001 et seq., and state regulations adopted pursuant to the Act, and also incorporated the Philadelphia Air Management Code and regulations adopted pursuant to the Code. In substance, both the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code, and the regulations adopted pursuant to the Act and the Code, prohibit malodorous emissions that constitute an air pollution nuisance, defined in part as being an emission of an air contaminant (which includes malodors) that tends to interfere with health, repose or safety or causes severe annoyance or discomfort or is offensive, objectionable or both to persons because of inherent chemical or physical properties of the emission.

9. Defendants moved to dismiss the complaint contending that the State and City odor emissions controls could not properly be included in a federally approved SIP adopted pursuant to the Clean Air Act, and therefore could not be enforced in federal court by a citizen's complaint filed under 42 U.S.C. § 7604. The motion to dismiss was denied by memorandum opinion and order dated April 23, 1985.

10. On May 11, 1985, defendants sought both a reconsideration and stay of proceedings. Defendants contended that EPA recognized that it had exceeded its authority in approving the Pennsylvania SIP that incorporated by reference State and City odor regulations and that EPA was in the process of promulgating a regulation that would withdraw approval of such portions of the Pennsylvania SIP. Defendants asserted that when EPA would thus "correct" the error, this court would lose jurisdiction under the Clean Air Act. The motions for reconsideration and a stay were denied.

11. On May 2, 1986, after public notice and hearing, EPA officially approved a revision to the Pennsylvania SIP, which effectively eliminated from the Pennsylvania SIP all odor emission control regulations. In so doing, EPA concluded that such regulations have "no significant relation to the attainment and maintenance of the National Ambient Air Quality Standards (NAAQS)." EPA further concluded that "there is no direct or indirect relationship between the State odor emission regulations cited below and any criteria pollutant." The revision was to be effective thirty days from date of publication in the Federal Register. Publication occurred on May 20, 1986 (Fed.Reg. 18438). Although the revision would be effective as of June 19, 1986, plaintiffs have filed with the Administrator of EPA a request for a stay pending review. On June 20, 1986, plaintiffs filed a petition for review with the United States Court of Appeals for the Third Circuit.

12. On March 24, 1986, plaintiffs moved to amend the complaint to allege a violation of Air Management Regulation V, Section X—Odors of the Pennsylvania SIP. The stated reason for the motion was that this regulation was not proposed for revision or deletion by EPA and would therefore be a valid basis for this court retaining federal jurisdiction even if the EPA revision was upheld as valid. Although the motion to amend was granted, plaintiffs, in fact, never filed the proposed second amended complaint and the case proceeded to trial on May 5, 1986 without such amendment. In any event, the EPA revision of the Pennsylvania SIP, as finally adopted, also eliminated Air Management Regulation V, Section X from the SIP.

13. On October 22, 1984, more than 60 days prior to filing this action, plaintiffs notified the then Managing Director of the City of Philadelphia, Leo A. Brooks, by certified mail, of intention to file this action charging the defendants with violation of the air emission regulations of the Clean Air Act, 42 U.S.C. § 7401 *et seq.* The notice expressly advised that the Northeast Plant would be alleged to be operating in violation of applicable air emission regulations of the Pennsylvania SIP, including regulations promulgated under the Pennsylvania Air Pollution Control Act, 35 P.S. § 4001 *et seq,* 25 Pa.Code § 123.31, and various specified provisions and regulations of the Philadelphia Air Management Code. Copies of this notice were also mailed to the following: William Ruckelshaus, Administrator of EPA; Thomas Eichler, Administrator of Region III, EPA; Leo Gonshur, Director of the Pennsylvania Department of Environmental Resources; William J. Marrazzo, Commissioner of the Philadelphia Water Department; Kenneth S. Cooper, Deputy City Solicitor for Environmental Affairs for the City of Philadelphia; William Reilly, Assistant Health Commissioner for the City of Philadelphia; Richard Thornburgh, Governor of Pennsylvania; W. Wilson Goode, Mayor of Philadelphia; Nicholas DiBenedictis, Secretary of the Pennsylvania Department of Environmental Resources.

14. No notice or copy of a notice was ever sent to the Attorney General of Pennsylvania. Before a resident of Pennsylvania may file a private action under the Pennsylvania Air Pollution Control Act to abate a nuisance or restrain or prevent a violation of the Act, thirty days' notice of intention to so proceed is statutorily required to be served upon the Attorney General of Pennsylvania. 35 P.S. § 4010(f).

*Odor Pollution Control*

15. Air Management Services, a division of the City of Philadelphia, Department of Public Health, is charged with the duty of enforcing the Air Management Code of Philadelphia and the regulations promulgated pursuant to the Code. Air Management Services also enforces the Pennsylvania Air Pollution Control Act within the geographical limits of the City of Philadelphia, in the specific instances that the Act is more stringent than the Code.

16. William Reilly is the Assistant Health Commissioner for Air Management Services for the City of Philadelphia. He has held this position since 1972. Air Management Services employs approximately twelve full-time air pollution inspectors who, among other duties, investigate complaints of air pollution, including complaints of violation of the odor regulations of the Air Management Code and Air Pollution Control Act. Air pollution inspectors are available, or at least on call, to make investigations of complaints and to make inspections twenty-four hours a day, seven days a week. During regular week-day working hours (Mondays through Fridays from 8:30 a.m. to 5:00 p.m.), approximately ten inspectors are available. From 5:00 p.m. to 8:30 a.m. on week-days and all the hours of Saturdays and Sundays, there is only one inspector on call to answer complaints. The air pollution inspectors' area of responsibility covers all of Philadelphia, and includes inspecting all complaints of air pollution from whatever source or area of the City and of all types, including odor pollution. The Northeast Plant operates continuously, *i.e.,* twenty-four hours per day, every day of the year.

17. Air pollution inspectors receive special training in odor detection as to the type and intensity of odor that would constitute a violation of the Air Management Code and/or the Pennsylvania Air Pollution Control Act. The Air Management Code defines "odor" as follows:

Smells or aromas which are unpleasant to persons or which tend to lessen human food and water intake, interfere with sleep, upset appetite, produce irritation of the upper respiratory tract or create symptoms of nausea or which by their inherent chemical or physical nature or method of processing are or may be detrimental or dangerous to health.

Any emission of an "odor," as so defined, constitutes a public nuisance under the Air Management Code, which, if detected by an air pollution inspector, would constitute a violation of the Air Management Code. Written notice of the violation, signed by the air pollution inspector would be provided to the owner or possessor of the land or facility from which the emission emanates, if the inspector is able to make such a determination. An inspector may make a finding of a violation only if he detects a malodor sufficiently strong to constitute a violation as of the time of the investigation or inspection. There are no scientific instruments or tests for ascertainment of malodors, and a determination of a violation is based on individual inspector's sensing the violation through his own sense of smell.

18. On each inspection where there is a determination of a violation, the air pollution inspector is required to complete a written form that notes, inter alia, the complainant's name and address, the time, the facility emitting the odor, whether a violation was determined to exist and, if so, its duration together with the inspector's statement of his observations, the person contacted at the offending facility, together with such person's explanation, if any, and the date and name of the inspector.

19. Based on records of Air Management Services, inspectors made determinations and filed written reports of violations by the Northeast Plant of the odor provisions of the Air Management Code and/or the Pennsylvania Air Pollution Control Act five times in 1983; fifty-five times in 1984; 107 times in 1985 and eight times in 1986 to the date of trial. The records of the Water Department, which received notices of violations, show a slight deviation from these figures. The records further establish a significantly higher number of complaints made, usually by residents of the area living in close proximity to the Northeast Plant, than violations determined by the inspectors. This difference between the number of complaints and the number of violations as determined by the inspectors is accounted for in two major ways: first,

the time lapse between the complaint and the inspection caused, in some instances, the odor to dissipate; second, the complainant's sense of smell suggesting a violation did not always agree with the inspector's sense of smell. To constitute a violation, malodors discharged into the ambient air by the Northeast Plant have to be of sufficient strength to cause an odor violation on adjoining properties beyond the boundaries of the Northeast Plant.

20. By far, the greatest number and frequency of complaints and determinations of violations occurred between May 1984 and July 1985. It was during this period of time that the most extensive amount of renovation of the plant was being undertaken. From August 1985 through the end of the calendar year 1985, there were twelve violations determined upon eighteen complaints. In 1986, there were no complaints or violations for the months of January and February; there were ten complaints with seven violations noted in March, and five complaints with one violation noted in April. In March 1986, electrical circuits in the Northeast Plant malfunctioned and, as a result, the primary sedimentation tanks could not properly be pumped to remove the settled solids, which proceeded to decay causing a severe odor problem for approximately one week.

21. The odors emanating from the Northeast Plant were graphically described by individual plaintiff-witnesses who lived in the vicinity, all of whom testified to the adverse effects the odors had upon them and/or their family and friends. The adverse effects were both physical and emotional.

22. Joseph Anderlonis, pastor of a church located approximately one-quarter of a mile from the Northeast Plant, detected at least four types of odors in the ambient air: (1) a sulfur odor; (2) a caustic glue odor; (3) a sour sewer smell; and (4) a stagnant water or liquid odor. He attributed the sour sewer smell to the Northeast Plant. He further described that smell to

be like a combination of sewer gas and a sour gaseous smell that comes from human vomit. At certain times of the year, he had to keep the windows of his living quarters closed. The odors have adversely affected him psychologically but not physically. The frequency of the odors diminished during the winter of 1985–1986, but he detected such odors twice in 1986.

23. Sharon Francis, an area resident for five years, has noticed odors coming from the Northeast Plant, from Franklin Smelting and from the Keystone Rendering Plant, each of which has a distinct smell. She described the smell from the Northeast Plant as "like a diaper pail that has been sitting with a lid on it for about three weeks." It disturbs her children who may be playing outdoors. The odors from the Northeast Plant cause her son to cough a great deal, and embarrass her if friends visit her. She cannot open the windows of her home, or hang her laundry outside without the odor permeating into the cleaned laundry and into the house. This type of odor has been present at least once a week during the last five years.

24. Mary Elton, another area resident, has lived in the vicinity for thirty-eight years. She has noticed odors coming from the Northeast Plant, Franklin Smelting, Rohm and Haas and Allied Corporation. The odors coming from the Northeast Plant smell to her like "a garbage bucket that's been in the sun all summer without being cleaned." She is usually away from her home and the neighborhood during the daytime. When the odors occur while she is home, she closes the house and remains inside. The odors make her nauseous and unable to breathe normally. The odors have in the past occurred about five times per month, but have been less frequent in 1986. The odors became worse when the renovations and rebuilding of the plant commenced.

25. Frances Pfeiffer, another reisdent of the Bridesburg area, lives directly across from the Northeast Plant. She has noticed odors that smell like "human waste" coming from the Northeast Plant. It makes her feel sick. She is unable to entertain company and relatives at her home when the odors are strong. Joseph Pfeiffer, her husband, described the odors as smelling exactly like an "outhouse." The odors cause him to suffer from nausea and headaches.

26. James Coppola has lived on Richmond Street directly across from the Northeast Plant for fifteen years. The area is zoned residential and a request by him for a zoning change to commercial was turned down ostensibly because he lived in a "fine residential area." In addition to odors from the Northeast Plant, he has noticed odors coming from "Franklin Smelting, Unitank, and occasionally, Keystone Rendering." The odor from the Northeast Plant was described by Mr. Coppola as "Terrible. Like open sewer, gassy odor sometimes. Chemical odor sometimes. A urine type odor sometimes." The odors cause him to feel nauseous and he gets headaches. It prevents outdoor barbecues. If it occurs on a weekend, he and his family usually leave the neighborhood.

27. Susan Larsen, who has lived a short distance from the Northeast Plant for the last seven years, has noticed odors from the sewage plant that smell like human waste and "a dirty outhouse." She has noticed these odors while traveling along U.S. Route I–95 on occasion. She believes the odors cause her serious headaches. Her children do not want to stay outside because the odor "is so bad."

28. Robert Kumosinski has lived close to the Northeast Plant for about twelve years. He has detected odors arising from Allied Chemical [Allied Corporation] and Rohm and Haas and from the Northeast Plant. Mr. Kumosinski lives about one mile from the plant, where the odor is nevertheless quite strong when the prevailing winds are blowing from the Northeast Plant toward Mr. Kumosinski's home. The odors can make one feel sick and queasy in the stomach and produce headaches. One particular "gaseous type odor" that comes from the Northeast Plant causes his elev-

en-year old son to turn white and immediately complain of a headache, thereby frightening Mr. Kumosinski. The odors have been noticed by him while traveling on U.S. Route I–95.

29. John Belland lives near the Northeast Plant on Richmond Street adjoining U.S. Route I–95. The Northeast Plant is directly behind his house. Although he has noticed odors from Keystone Rendering, Rohm and Haas and Franklin Smelting, the worst odor comes from the Northeast Plant. The odor, when present, requires that he close all the windows of his house, makes him nauseous, tired and listless, and on occasions he leaves the vicinity.

30. The official records of Air Management Services establish that, at least since 1984 to the date of the trial, there have been frequent and continual violations of the Philadelphia Air Management Code and the Pennsylvania Air Pollution Control Act and the respective regulations in that the Northeast Plant has caused foul-smelling odors to escape into the ambient air and spread onto adjoining properties in the neighborhood. Defendants and intervenor-defendants offered no evidence to the contrary, but instead offered evidence by way of explanation for the violations.

31. Air Management Services has been responsive to citizen complaints, and upon receipt of a complaint by telephone, in most cases will make an on-site investigation within fifteen minutes to one hour from the time of the complaint. All of the resident citizen witnesses who testified on behalf of plaintiffs, testified, in effect, that most, if not all, complaints were promptly responded to by Air Management Services, although the inspector frequently would not determine that there was an odor violation as of the time of the inspection, and often disagreed with the complainants as to the intensity of the bad odors.

*Improvements to the Northeast Plant*

32. During or about 1983, the major construction for renovating and upgrading the Northeast Plant commenced. As of the time of the trial of the case, most of the contemplated work had been completed. Some additional construction is required. Not all of the "improvements" were fully tested or operational at the time of the trial. Under the terms of the consent decree, the work should have been completed and the renovated plant completely operational before the date of trial.

33. One of the major sources of malodors arising from the Northeast Plant was the so-called Grit Building, where raw sewage initially entered the plant. That building is no longer in service, although it remains intact and, due to some leakage, infiltrate does go into the Grit Building and has to be pumped out. Plans, indefinite as to exact time, are to block the leak and completely shut down the Grit Building.

34. The Grit Building has been replaced by a so-called Preliminary Treatment Building, a four-story structure that contains many improvements over the Grit Building; including, inter alia, influent from the sewer lines being completely enclosed, above ground air exhaust, greater area within the building for disposal of malodorous molecules, more adequate heating, and ozonators to process the odors (not functioning at the time of trial). In addition, the Preliminary Treatment Building has two multiple hearth incinerators, designed to incinerate grit screenings from the preliminary treatment process and detriter process. These grit screenings were, as of the time of the trial, still being stored and hauled away by truck, because the incinerators had not yet been made operational. The hauling process is a constant potential source of odor pollution.

35. Another major cause of odors arising from the Northeast Plant had been the sludge heaters, a submerged combustion process that applied a flame directly into the sludge. The sludge heaters have been replaced by fully enclosed tube heat exchangers, eliminating the direct flame-burning process and thereby reducing odors from the heating process. The open flame sludge heaters were taken out of service in August of 1985.

36. Entirely new digestors have been installed, all of which now have fixed covers, rather than the floating type of covers formerly utilized.

37. The number and capacity of the settling tanks have been increased. As a result, there should be less build-up of odor-causing scum. Also, the frequency of taking a tank out of service and draining it for repairs and maintenance will be reduced. Such maintenance of a tank is a cause of odor problems. As a part of the renovations, both the influent and effluent portions of the primary settling tanks have been enclosed, where turbulence may cause odors, and these buildings have ozonators.

38. The treating process also requires aeration by means of rotating biological contactors. New ones were installed but were found to contain design defects when placed in operation in mid–1985. The contractor repaired the defects and this portion of the renovated system is now fully operational.

39. Sludge from the settling tanks is presently being dewatered into a semi-solid state and then transported by truck to the Southwest Water Pollution Control Plant for final disposition. It is planned that this sludge will in the future be transported by pipeline a short distance to the Delaware River where it will be pumped unto barges and transported by barge to the Southwest Water Pollution Control Plant. The present system causes some odors during the transportation.

40. The renovations to the Northeast Plant when finally completed and operating as intended should reduce to a minimum any malodors emanating from the Northeast Plant caused by the processing and treatment of the sewage, whether such odors are caused by the biological processes of decomposition of the sewage or from volatile chemicals and other organic sewage material. However, as of this time, the renovations are not yet complete and defendants have not presented any evidence that they will be completed pursuant to any fixed timetable.

## Chemical Sources of Odors

41. The Northeast Plant accepts into its plant industrial sewage, including chemical discharges from various industrial plants, subject to limitations imposed under the Clean Water Act. Certain of these discharges include volatile organic chemicals, many of which when released as gases into the ambient air produce strong unpleasant and harmful odors.

42. Chemical odors have frequently been noted by employees working within the old Grit Building. When such odors are detected, the employees are advised to evacuate the building, because such chemicals can have toxic effects on humans and also because certain of them, when sufficiently concentrated, cause a danger of explosion upon ignition. Tests made by the Water Department's Industrial Waste Unit at these times showed air samples of volatile organic substances in the Grit Building far in excess of recognized odor detection levels.

43. Several of the resident witnesses on behalf of plaintiffs testified to various occasions when they detected chemical odors, as distinct from sewage odors, coming from the Northeast Plant.

44. Air Management Services conducted a series of tests over the course of a year, from October 1984 through September 1985, by simultaneously taking ambient air samples both upwind and downwind at the fencelines of the Northeast Plant. There being no scientific test for odors, the tests were for certain detectable gases, mostly volatile organic chemicals. The results of these tests failed to show that any substances were in the air downwind from the plant in sufficient concentration to be within the range generally accepted by experts in the field as being odor-recognizable to a person with a normal sense of smell. At least one of these tests was conducted when there was a known chemical spill that had entered and was in the Northeast Plant.

45. A chemical spill is a non-permitted discharge, whether accidental or intentional, of a chemical substance into the sewer

system, either by reason of the quantity, concentration or type of substance. A chemical spill of some volatile organic substances, when in sufficient concentration, can and does cause chemical malodors within the Northeast Plant. These malodors can and have been discharged through the sewage treatment process and through artificial ventilation of certain of the buildings, especially the old Grit Building, into the ambient air in such concentration as to cause the malodors to cross over the boundaries of the Northeast Plant into adjoining and neighboring properties, including residential properties of the plaintiffs.

46. Of a total of 189 inspection reports prepared by air pollution inspectors that were received in evidence, two of the reports, occurring in late 1984, made specific reference to chemical odors detected.

47. One of the odors claimed by some of the witnesses to have been detected in the air beyond the boundary of the Northeast Plant was cumene.

48. The Industrial Waste Unit of the Water Department, as one of its functions, seeks to determine the sources of volatile organic compounds that arrive through the sewer lines as influent in the Northeast Plant. The Industrial Waste Unit determined that in 1983 and 1984 there was a problem with cumene originating at the plant of intervenor-defendant, Allied Corporation. With cooperation from Allied Corporation, it was determined that cumene in the ground water on Allied Corporation's land was infiltrating directly into the industrial waste sewer lines of the plant. The problem was corrected by developing a system of drawing off the excess ground water containing cumene and otherwise preventing its infiltration into the sewer system.

49. Chemical spills have on occasion contributed to malodors in the neighborhood. They have been infrequent and have not been shown to have been caused by any industrial plant that has been permitted to discharge its industrial wastes into the sewer system, with the exception of the cumene infiltration traced to Allied Corporation's plant.

*Summary of Air Pollution Violations*

50. The records of the Water Department of the City of Philadelphia show that it received 177 notices of air pollution violations (violations of either the Philadelphia Air Management Code or of the Pennsylvania Air Pollution Control Act, or both) from January 1983 through to the end of April 1986. The records of the Air Management Services show a total of 175 notices of violations during that same period of time—an insignificant but unexplained discrepancy. In addition, there were many more complaints of odor violations by persons living in the vicinity of the Northeast Plant that were investigated by air pollution inspectors, for which no formal notices of violation were issued.

51. Although the new plant is now in full operation, and has been since approximately late December 1985, very bad odors that are clear violations of the Philadelphia Air Management Code and the Pennsylvania Air Pollution Control Act continue to occur with substantial frequency. There are various causes of these continuing violations such as (1) improper maintenance, (2) equipment malfunction, (3) ozonators not properly functioning, (4) draining and repairing of old holding and sedimentation tanks.

52. The National Pollution Discharge Elimination System standards, applicable to the Northeast Plant, limit the discharge of suspended solids into the Delaware River to 62,600 pounds per day. In December of 1985, the Northeast Plant, pursuant to the consent decree, was to be in compliance with those standards. Tests showed that the Northeast Plant was discharging 110,-000 pounds of solids per day and that it is not now and has never complied with the National Pollution Discharge Elimination System standards.

53. Ozonators are provided in the Preliminary Treatment Building and in the primary sedimentation tank buildings that enclose the turbulent areas of influent and effluent to the sedimentation tanks. As of

the time of the trial, none of the ozonators nor the ozonating systems were operating or in operable condition. The Preliminary Treatment Building had been in operation for approximately eight months before the trial. Ozonators are intended to be an integrated part of the ventilation system for the buildings. Ozonators are designed to oxidize and thus eliminate odor causing substances in the air, before they are discharged from the buildings through the ventilating systems. Because they have not been as yet placed in operation, despite repeated unsuccessful attempts, it is not known how effective they will be in actual operation.

### Discussion

The City of Philadelphia operates the Northeast Water Pollution Control Plant through the City Water Department. The Northeast Plant has violated and continues to violate the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code by causing and permitting malodors to be discharged into the ambient air and carried unto land and properties beyond the boundaries of the Northeast Plant.[1] These malodors are frequent and intense. They have and continue to cause serious physical and emotional harm, annoyance and discomfort to residents of normal sensibilities living in the neighborhood surrounding the Northeast Plant. To the extent that the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code, together with their respective regulations are a part of the EPA-approved Pennsylvania SIP under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the City of Philadelphia, as operator of the Northeast Plant has violated and continues to violate the federal Clean Air Act as well as the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code. The continuing and unreasonable

discharges of malodors to the great harm, annoyance and discomfort of nearby residents and the public generally constitutes a continuing public nuisance.

The evidence is quite clear that highly obnoxious odors are frequently discharged into the air from the Northeast Plant. Defendants presented no evidence challenging or contradicting the many air pollution violations as determined by Air Management Services through on-site inspections by air pollution inspectors. The local residents who graphically testified as to the adverse effects the odors have upon them, their families and friends are completely credible. Obviously some persons are more sensitive to and offended by malodors than other persons. Giving adequate allowance for varying degrees of sensitivity, the evidence clearly establishes that the neighborhood residents have been long suffering. They are not simply complaining about a petty annoyance, or a condition that cannot be alleviated by reasonable measures. They live in a residential area, as zoned by the defendant, City of Philadelphia. They are entitled to a quality of air consistent with such zoning and land use.

The evidence establishes that the Northeast Plant, as well as any other public sewage disposal system, if properly designed, constructed and operated, can serve its important public function without causing any serious odor problem in the neighborhood. Repeatedly, throughout the trial, defendants referred to the renovated and updated plant, when fully completed and properly operating, as being "the state of the art," meaning, of course, that the plant should be the most modern and efficient as is presently technologically possible. This contention appears reasonable in light of capital expenditures for the improvements, repairs and renovations exceeding Three Hundred Million Dollars. Every witness who testified on the subject, including de-

---

1. Subsequent to the trial, counsel sent copies of correspondence to the court. Although not a part of the trial record, it seems clear that residents are continuing to complain of malodors subsequent to the date of the trial and the City of Philadelphia admits that some odor

problems at the plant have recently been created by malfunctioning equipment. The trial evidence establishes continuing odor problems to the date of trial. Air Management Services cited the Northeast Plant for violations during the month in which the trial was held.

fense witnesses, agreed that if the present plant, as renovated, is properly maintained and all systems and equipment are functioning properly and as intended, no odor air pollution should escape from the Northeast Plant into the ambient air in such quantity or concentration as to cause any serious annoyance or discomfort to any person or to impede any landowner in the rightful use and enjoyment of such landowner's property. Plaintiffs' expert witnesses, although "suggesting" some possible improvements to the system, provided no credible testimony that the design of the renovated plant or its component parts or systems should be altered or changed or that it was inadequate or defectively designed.

The defense focused primarily on the contention that the City of Philadelphia and its agencies and officials are doing the best it and they can to alleviate and eliminate odor problems. They further contend that all odor problems will be resolved satisfactorily if afforded sufficient time to work out all of the "bugs" in the system. Without in any way questioning the good faith of these assertions by defendants, such assurances can have no more than a hollow ring to the neighbors who are forced by circumstances to live in the frequently occurring stench from the Northeast Plant and who have heard these assurances for well over three years with little or no apparent improvement.

One of the primary sources of malodors was the so-called Grit Building. According to the evidence, that building and its facilities were taken out of service in March, 1986. Log books of the operations within the Grit Building establish that the building and its processing of the sewage was very poorly maintained. The Grit Building was the place where the sewage first entered the Northeast Plant for processing. According to the expert witnesses who testified, poor maintenance and allowing unsanitary conditions to exist in the Grit Building were major sources of odors emanating from the Northeast Plant. The Grit Building, although presently out of service, remains physically connected to the system and could and would be utilized if there is any serious malfunction or breakdown in the new Preliminary Treatment Building, which building now performs the tasks formerly handled in the Grit Building as well as additional processing work. Also, defense witnesses conceded that there was some influent leakage into the Grit Building that required regular removal, apparently by pumping. Meanwhile, the potential that foul odors will accumulate and be vented out of the building at or near ground level and into the surrounding air remains. There are no ozonators or other equipment in the Grit Building for removing or neutralizing odors before they are discharged into the air at or near ground level through the powered ventilation system.

Ozonators are the great hope of the defendants for solving the major odor problems. A system of ozonators has been installed in the Preliminary Treatment Building and in the buildings that enclose the influent and effluent ends of the primary sedimentation tanks. By adding ozone to the air before it is discharged from the buildings into the atmosphere, it is expected that the ozone will oxidize and thereby neutralize odors caused by decomposition of sewage material and odors caused by volatile chemicals. Because the system has not yet been satisfactorily put into operation, how effective it will be remains uncertain.

The ozonator system in the Preliminary Treatment Building has been tested, but because of complicated technological difficulties in adjusting automatic regulators that will control the amount of ozone to be added to the air, the system has not become operational. Witnesses for the defense testified that it would be put into operation within one week following the end of the trial. Attempts to put the system into operation have been made since September 1985. Some of the long delay may have been caused by disputes with the contractor as to responsibility for operation of the ozonating system.

There is no direct evidence that any of the foul odors coming from the Northeast Plant originate within the Preliminary Treatment Building or the buildings over the ends of the primary sedimentation tanks, both of which areas are designed for ozonators. However, the potential for odors coming from these buildings so long as the ozonators are not operating is clear. Ozonators were designed specifically to address the odor potential. Odors are continuing to come from the Northeast Plant. It is reasonable to conclude that lack of operational ozonators is a factor in the continuing discharge of malodors by the Northeast Plant.

Deputy Water Commissioner Thomas Walton, who has been in charge of the operations at the Northeast Plant since 1980, presented extensive testimony that exposed several causes for malodors escaping from the plant and also pointed out potential future odor problem areas. From his testimony, as well as that of other witnesses, one of the major sources of foul odors was in the Grit Building. The new Preliminary Treatment Building, that replaces the Grit Building, was "phased in" during the fall of 1984 and the following winter. Although the Grit Building was, as of the time of the trial, completely out of service, Mr. Walton testified that it "could be restored to service, if we were to find that during the continuing start-up and shakedown of the pumps in the Preliminary Treatment Building, we would encounter a problem that would require us to go back to it." It is clear from the testimony that the "start-up and shakedown" of the pumps in the Preliminary Treatment Building has not been completed, even though utilization of the new building's facilities was "phased in" commencing in the fall of 1984. The potential of utilizing the now defunct Grit Building remains a distinct and disturbing possibility. As Mr. Walton testified: "At such times as we were [sic] completely confident in the operation of the PTB [Preliminary Treatment Building], the flow into the old Grit Chambers will be completely blocked off in the junction chamber."

Mr. Walton testified to another potential odor source and problem. Screenings and grit in the Preliminary Treatment Building are currently being trucked off-site to temporay storage at the Southwest Plant. This was because the incinerators in the Preliminary Treatment Building, designed to reduce the grit to inert ash, were not yet, according to Mr. Walton, "started up for full operation." The present hauling system is obviously a potential source for escaping odors.

Until the ozonators are properly functioning, any foul odors created inside the buildings that cannot be dissipated within the limited confines of the buildings will be vented by high volume fans into the ambient air from the rooftops. Foul odors, whether created by decomposition of raw sewage or from chemical spills, will thereby be released. Mr. Walton testified that the ozonator system was "still undergoing start-up, and we are awaiting and working with the contractor and vendor to place it into full operation."

Another serious potential odor problem will occur when the thirty-year old primary sedimentation tanks are "rehabilitated." This work, according to Mr. Walton, cannot be started "until the plant is fully operational, including modification to some of the existing final tanks." Mr. Walton also testified that work on the old final settling tanks that are scheduled to be taken out of service and others that are to be "rehabilitated" will be started as soon as the grant award is made by EPA. These tasks will obviously cause odors to escape unless conducted in a very careful manner.

Presently, sludge is being de-watered and converted into semi-solid sludge cake on site and then conveyed by truck to the Southwest Plant. Until such time as the barging operation is put into effect, truck removal presents an admitted odor hazard.

Scum from the surface of the primary and final sedimentation tanks was formerly incinerated on site. During the renovations, this process was discontinued. Scum is presently collected by a vactor truck

(type of suction machine), and discharged into open air lagoons remaining on the site. The lagoons are treated with lime to avoid or minimize odors. The open lagoons are quite obviously a source of potential foul odors. A new scum incinerator has been constructed and, according to Mr. Walton, is presently being "debugged."

From the testimony of Mr. Walton, whose testimony I find to be credible, as well as all the other evidence and testimony in the case, it is apparent that much work remains to be done before the sources and causes of serious malodors may reasonably be expected to be eliminated. What is disturbing is that although defendants have taken the litigation position that the new renovated plant is now "on stream" and fully operational, in fact, much remains to be done and major equipment that optimistically may eliminate odor problems is not functioning. Despite many attempts over a long period of time, defendants have thus far been unable to have the equipment function properly. Equally disturbing, defendants have not provided any specific timetable when the additional work to be done will be completed.

The Water Department has taken several interim measures in an attempt to control odors arising from the Northeast Plant during the renovation and rehabilitation of the plant. These include assigning a qualified engineer on duty until ten o'clock at night to be in charge of any emergency odor control problem and to make "odor tours" around the perimeter of the plant. Deodorizing equipment was attempted to be used in the old sludge heater building (an admitted major source of odors escaping into the air) without any appreciable degree of success. Attempts were made to force air through wood chips to modify the odor of the air that was vented from the sludge heater building. A contractor has been available to lime the accumulations of grit stockpiled for truck removal; and to lime the lagoons used to hold the removed scum. Deodorizing masking sprays have been used around the perimeters of the sedimentation tanks. As Mr. Walton testified, because of earlier overloading, the primary sedimentation tanks have been failing "with an alarming frequency causing a difficult odor source from accumulated sludge in the bottom of such tanks." Potassium permanganate has been applied to exposed sludge accumulations to avoid septic conditions from developing and thereby producing objectionable odors. Finally, contractors have been employed to speed up tank cleaning and repairs.

There was substantial testimony that the odor problems at the Northeast Plant are diminished from the time that major reconstruction and renovation was taking place in 1983 and 1984. The records of Air Management Services of violations by the plant establish that up to the time of the trial there were continuing and frequent malodor discharges by the plant. The evidence further establishes that the odor problems have not been solved despite the claimed best efforts of the defendants. Much additional work, repair and renovation remains to be done, and a substantial amount of that to be done presents potential air pollution problems, the extent of which are quite uncertain. The short term future appears very bleak for the neighborhood community.

What, if anything, as a practical matter, can the court do to help alleviate the problem? Wholly aside from the difficult legal issues of this court's authority to issue injunctive relief under the federal Clean Air Act or as relief for a pendent state claim under the Pennsylvania Air Pollution Control Act or for a common-law nuisance, will any enforceable decree bring about a correction of the problem? I have no doubt that the officials of the Water Department responsible for operating the Northeast Plant are sincerely attempting to take reasonable steps to minimize the discharge of offensive odors into the air. All of the City witnesses who testified on the subject either expressly or by clear implication asserted therein that when all of the contemplated work is completed and the whole system is finally fully tested and operating as intended and expected there should be no further air pollution problems.

However, the law does not and should not provide any allowance for air pollution violations. At common law, neither individuals nor municipalities have the right to maintain for any period of time activities that constitute a public nuisance, irrespective of lack of fault or due care. Because the Northeast Plant can be operated without creating a public nuisance, it must be so operated.

To issue a simple injunction prohibiting the City from doing that which the law clearly prohibits may, on first impression, appear to be of little value and redundant. Because of the power of a court to enforce a valid injunction through contempt proceedings, there are, however, practical benefits to such a general injunction. Repeated notices of violations by the Air Management Services have been of little, if any, practical help in preventing further violations. At a minimum therefore, this court, if it has jurisdiction in this case to do so, should enjoin continuing violations even though ultimate enforcement may require contempt proceedings.

By Memorandum Opinion dated April 23, 1985, I ruled that I had no right to review or invalidate EPA's approval of the Pennsylvania SIP. Pursuant to 42 U.S.C. § 7607(b), a petition for review must be filed with the court of appeals. Defendants in this case filed such a petition after this case was instituted. The court of appeals dismissed the petition as untimely. Therefore, at the time this action was filed, the Pennsylvania SIP incorporated the odor pollution provisions of the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code. This action filed pursuant to the "Citizen's Complaint" provision of the Clean Air Act, 42 U.S.C. § 7604, afforded jurisdiction. By revision of its approval, EPA eliminated from the Pennsylvania SIP the odor pollution provisions of the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code. If this revision was validly adopted, it became effective June 19, 1986, subsequent to the date of the trial. A petition for review as to the validity of the revision has been filed by plaintiffs with the court of appeals. No stay as to the effectiveness of the revision has been entered.

This court had valid federal jurisdiction when this action was filed. Federal jurisdiction continued at least through the date of completion of the trial. The revision of the Pennsylvania SIP, even if held by the court of appeals to be valid would not thereby cause the district court to lose all jurisdiction, although it might, as of this date,, preclude the entry of any injunctive or other relief under the Clean Air Act.

On a motion to dismiss, filed the morning set for the commencement of the trial, I ruled from the bench that the district court had jurisdiction to hear the federal claim and that there were valid pendent state law claims that would also be tried at the same time. Even if, by reason of the now adopted revision of EPA's approval of the Pennsylvania SIP, the district court may no longer have the power to issue an injunction under the "Citizen's Complaint" provisions of the Clean Air Act, 42 U.S.C. § 6504, it would still retain jurisdiction to decide pendent state claims. *Rosado v. Wyman*, 397 U.S. 397, 404–405, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970); *Nationwide Mutual Insurance Company v. T & D Cottage Auto Parts*, 705 F.2d 685, 687 (3d Cir.1983).

The complaint did not expressly seek relief on the basis of any pendent state claim. It is clear, however, that prior to trial, plaintiffs asserted their intention to rely on pendent state causes of action under the Pennsylvania Air Pollution Control Act. This was brought about because of the proposed revision of the EPA approval of the Pennsylvania SIP. Violations of both the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code were expressly alleged in the complaint. Reliance at trial on the pendent state claims in no way surprised or caused prejudice to the defendants. No evidence was introduced that was not subject to prior discovery. As part of plaintiffs' proof of violation of the Clean Air Act, plaintiffs

were required under the pleadings to prove violations of either or both the Pennsylvania Air Pollution Control Act or the Philadelphia Air Management Code. This same evidence was likewise relevant and essential to establishing a common-law nuisance. Thus, plaintiffs' reliance on the state pendent claims caused neither surprise nor prejudice to defendants.

■ To bring an action or suit in equity under the Pennsylvania Air Pollution Control Act, the statute expressly requires thirty days prior notice be served upon the Attorney General. No such notice was ever provided to the Attorney General although prior notice was provided to many state and city officials. (See Finding of Fact 13). Those notices were obviously given in order to comply with notice provisions of the Clean Air Act, 42 U.S.C. § 7604(b), which require notice to the state, but not necessarily to the State Attorney General. Although plaintiffs argue that the Attorney General obviously had notice, I cannot accept that as being in compliance with the express statutory requirement that such notice be *served* on the Attorney General. Nor can I accept the argument, in the absence of some controlling state court decision, that the Act is merely directory and not mandatory. In my view, the absence of such notice precludes the plaintiffs from proceeding, as a pendent cause of action, under the Pennsylvania Air Pollution Control Act for an injunction under 35 P.S. § 4010(f).

■ This, however, does not complete the inquiry. The Pennsylvania Air Pollution Control Act expressly provides that "this act is to provide additional and cumulative remedies to abate the pollution of the air of this Commonwealth." 35 P.S. § 4012(g). Also, 35 P.S. § 4012.1a provides in part:

It is hereby declared to be the purpose of this act to provide additional and cumulative remedies to abate the pollution of the air of this Commonwealth, and nothing contained in this act shall in any way abridge or alter rights of action or remedies now or hereafter existing in

equity, or under the common law or statutory law, criminal or civil, nor shall any provision of this act ... be construed as estopping the Commonwealth, persons or municipalities, in the exercise of their rights under the common law or decisional law or in equity, from proceeding in courts of law or equity to suppress nuisances, or to abate any pollution now or hereafter existing, or enforce common law or statutory rights. No courts of this Commonwealth having jurisdiction to abate public or private nuisances shall be deprived of such jurisdiction to abate any private or public nuisance instituted by any person for the reason that such nuisance constitutes air pollution.

35 P.S. § 4013 provides:

A violation of any order or of any provision of any rule or regulation promulgated pursuant to a local air pollution code or to a State air pollution act, which limits or controls the emission of any air contaminant shall constitute a public nuisance and shall be abatable in the manner provided by law.

A statute could hardly be more specific that common law remedies remain. If a court finds a violation of either or both the Air Pollution Control Act or the Philadelphia Air Management Code, on the suit of residents, the court may enjoin such violations as public nuisances, notwithstanding failure to give prior notice to the State Attorney General.

■ Consequently, irrespective of whether plaintiffs may obtain injunctive or other relief under the federal Clean Air Act because of the revision of EPA's approval of the Pennsylvania SIP, and irrespective of whether plaintiffs may maintain a state statutory claim under the Pennsylvania Air Pollution Control Act for injunctive or other relief such as civil monetary penalties because of failure to notify the Attorney General of Pennsylvania, plaintiffs may nonetheless proceed in this action against defendants in equity to enjoin and abate as a common law nuisance, the air pollution being created by the defendants at the Northeast Plant. This court has and will

assert pendent jurisdiction as to the common-law claim of maintaining a public nuisance.

The intervenor-defendants operate industrial plants that discharge certain industrial wastes into the sewers leading to the Northeast Plant. They intervened to prevent any injunctive relief that would adversely effect their continued use of the public sewers to dispose of certain industrial wastes. There is ample evidence that chemical spills have from time to time occurred, which result in strong and obnoxious chemical odors being emitted from the Northeast Plant. There is, however, no evidence that such odors are caused by the regulated industrial waste discharges from either of the intervenor-defendants, with the exception of the cumene problem at Allied Corporation's plant. That problem was satisfactorily corrected long before the trial. There is no evidence upon which to conclude that any of the present and continuing odor problems are caused by either intervenor-defendant.

The sources of any chemical odors in the ambient air in the vicinity of the Northeast Plant are, at best, difficult to trace. A strong sewer or sewer gas odor in the vicinity may logically be found to come from the Northeast Plant, especially when the odor is more noticeable downwind from the plant. Chemical odors, however, are more difficult to trace to the Northeast Plant. In the immediate vicinity there are several chemical plants, including the plants of both intervenor-defendants. This case involves claims of malodors arising from the Northeast Plant, not odors coming from other industrial plants. Although no industrial plant, including either intervenor-defendant, has a right to pollute the air with foul chemical odors, so far as this action is concerned, only if such chemical odors come from and through the sewer system at the Northeast Plant would injunctive or other relief as to chemical odors be appropriate.

Plaintiffs failed to establish by a preponderance of the evidence that either of the intervenor-defendants presently causes or is likely to cause in any way any of the malodors, including chemical malodors, coming from the Northeast Plant. Injunctive relief against either of the intervenor-defendants would not be justified on the basis of the evidence presented.

■ Plaintiffs seek various types of injunctive relief. General injunctive relief against committing a public nuisance by the Northeast Plant emitting malodors into the ambient air seems clearly appropriate. A provision that defendants be enjoined from violating the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code, to the extent that such violations constitute a public nuisance is also appropriate. Even though this case is being decided and relief granted on the basis of a common-law public nuisance, the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code, in substance merely specify and codify certain of the common law as to what constitutes a public nuisance. In addition, it is the obligation of the Northeast Plant to operate in conformity with the odor provisions of both the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code. Clearly the plant has not operated within the requirements of either the statute or the code.

Plaintiffs seek the court to specify on a sliding scale the amount of monetary penalty that shall be assessed in the event of future violations, to be paid to the Clean Air Fund of the Commonwealth of Pennsylvania. Although the Pennsylvania Air Pollution Control Act provides for specific monetary penalties payable to the Clean Air Fund, 35 P.S. 4009.1–4009.2–4010, because no notice was served on the Attorney General as provided by the Act, the procedures and remedies therein specified are not applicable. I find it unnecessary at this stage of the proceeding to specify what penalties, or other sanctions, may or will be imposed in the event of any violation of the injunction. Those matters may more properly be determined when and if there is a finding of contempt for violation of any injunction.

The proposed relief requests that an order implementing certain procedures and imposing reporting obligations when complaints of odor pollution are received be put into effect. Defendants assert that most of these procedures are already required or are otherwise adequately covered by other procedures, making such requirements by court order unnecessary and redundant. Certain requirements will be specified to be sure that the public and the court are adequately advised and notified of future odor problems at Northeast Plant and of corrective measures taken, and as to progress for finally putting the renovated plant in complete and proper functioning order.

■ Plaintiffs ask the court to award attorney fees and costs, including expert witness fees. Under state law, attorney's fees and costs by successful plaintiffs are not recoverable, either at common law or under the Pennsylvania Air Pollution Control Act. Under the federal Clean Air Act, 42 U.S.C. § 7604(d), the court, in issuing any final order, "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."

Plaintiffs chose to file this action in federal court, despite serious questions as to federal jurisdiction because of the questionable validity of EPA's approval of the odor provisions of the Pennsylvania SIP. Plaintiffs' counsel frankly stated that the primary reason for seeking relief under the federal Clean Air Act was because of the provision for possible attorney's fees and expert witness costs. An attorney representing a client is fully justified, and arguably obligated, where there is a choice of forum, to select the forum where the matter may be litigated at the least cost to the client, all other considerations being equal. This action was filed on behalf of an entire community. Plaintiffs were represented by the Public Interest Law Center of Philadelphia, so-called "Pilcop." It is well known that one of Pilcop's main sources of revenue is derived from successful litigation in cases where statutory fees are provided.

As noted previously, I have ruled that this court acquired federal jurisdiction under the Clean Air Act, 42 U.S.C. § 7604, and that it would accept pendent jurisdiction as to the state statutory and common-law claims. There is grave doubt that any viable federal claim existed subsequent to June 19, 1986, the effective date of EPA's revision of its approval of the Pennsylvania SIP, which eliminated the odor provisions from federal approval. This case has been decided and the relief to be granted will be founded solely on the basis of the pendent state common-law nuisance claim.

The question presented is whether it would be "appropriate" to award attorney's fees and costs pursuant to 42 U.S.C. § 7604(d), even assuming the right to award fees and costs in this case. I have ruled that the federal claim was and remains sufficient to provide federal court jurisdiction and to permit a final decision on the pendent state claims. However, because relief will be granted solely on the state common-law public nuisance claim, under the facts of this case, I do not find it appropriate to award any attorney's fees or costs. I so conclude notwithstanding the consideration that it was entirely proper to file this action in this court and seek attorney's fees and costs. In my view, only if some relief is awarded under the federal statute, would the award of attorney's fees and costs be appropriate. At the present time, this court probably could not validly provide any injunctive or other relief under the federal Clean Air Act. At least, no such relief will be granted. Consequently, attorney's fees and costs under that Act are not appropriate and will not be awarded.

To the extent that the "Discussion" portion of this opinion contains findings of fact and/or conclusions of law not set forth separately under the respective findings of fact or conclusions of law sections of this opinion, the same shall be deemed as additional findings of fact and/or conclusions of law.

## Conclusions of Law

1. This court has subject-matter jurisdiction and has jurisdiction over the parties to this action.

2. Venue in this district is proper.

3. The Northeast Water Pollution Control Plant of the City of Philadelphia continues, as it has in the past, to discharge and emit into the ambient air, malodors that cause substantial harm, injury, annoyance and discomfort to residents and persons in the vicinity of the Northeast Water Pollution Control Plant.

4. The malodors that have been and continue to be emitted from the Northeast Water Pollution Control Plant are unnecessary and unreasonable.

5. The malodors that have been and continue to be emitted from the Northeast Water Pollution Control Plant constitute a public nuisance.

6. The City of Philadelphia, through its Water Department, owns, operates, controls and maintains the Northeast Water Pollution Control Plant.

7. The City of Philadelphia continues, as it has in the past, to maintain a public nuisance caused by the malodors being discharged into the ambient air and being permitted to escape from the lands of the Northeast Water Pollution Control Plant into adjoining, separate and other lands and property.

8. Plaintiffs are entitled to an injunction against the City of Philadelphia to abate and preclude the continuing public nuisance.

9. Plaintiffs have not proved by a preponderance of the evidence that either of the intervenor-defendants, Rohm and Haas Company or Allied Corporation, are the cause of any continuing malodors being emitted from the Northeast Water Pollution Control Plant.

10. An award of attorney's fees and costs to plaintiffs, pursuant to 42 U.S.C. § 7604(d), is not appropriate, and fees and costs will not be awarded to plaintiffs.

## ORDER

Based upon the foregoing opinion containing findings of fact, discussion and conclusions of law, and after a full trial on the merits, it is

Ordered, Adjudged and Decreed as follows:

1. The City of Philadelphia is enjoined from maintaining and operating the Northeast Water Pollution Control Plant of the City of Philadelphia in violation of the odor emission provisions of the Pennsylvania Air Pollution Control Act, 25 Pa.Code § 123.31, and of the Philadelphia Air Management Code §§ 3–102(3), (5), (25) and § 3–201(a)(3), and the respective regulations of the Pennsylvania Air Pollution Control Act and the Philadelphia Air Management Code.

2. The City of Philadelphia is enjoined from maintaining and operating the Northeast Water Pollution Control Plant in such a way or manner as to cause the emission into the ambient air of any malodor of such intensity, quantity and concentration as unreasonably to cause injury, harm, annoyance, or discomfort to persons of normal sensibilities who are not on the land of the Northeast Water Pollution Control Plant.

3. Whenever the Northeast Water Pollution Control Plant is notified by Air Management Services of a violation of the Philadelphia Air Management Code or the Pennsylvania Air Pollution Control Act, the City of Philadelphia, through its Water Department shall promptly make a comprehensive investigation of the source and cause of the violation and take all reasonable actions and measures to eliminate the violation and any potential repetition. Within seventy-two (72) hours of receipt of notice of a violation from Air Management Services, a detailed written report showing full compliance with this portion of the order shall be signed by the supervisor in charge of the Northeast Water Pollution Control Plant and by the Commissioner or Deputy Commissioner of the Water Department of the City of Philadelphia, and filed in this action with the court, with a copy to counsel for plaintiffs.

4. Whenever an individual makes a complaint of an odor emission violation by the Northeast Water Pollution Plant to Air Management Services, and Air Management Services, whether upon investigation or not, fails to find and notify the Northeast Water Pollution Control Plant of a violation, upon the signature of three or more adult persons attesting to the time and place of the claimed violation and served upon whomever may be for the time being the supervisor in charge of the Northeast Water Pollution Control Plant and/or the Commissioner or Deputy Commissioner of the Water Department of the City of Philadelphia, an investigation and report shall be made and filed as provided in paragraph 3 of this order.

5. In the event that three (3) or more reports as required by paragraph 3 and/or 4 of this order are required to be filed with the court within any period of thirty (30) days, upon application of any party or upon the court's initiative, sua sponte, a prompt hearing for contempt may be held. Nothing herein shall preclude plaintiffs or any other party having a proper interest from seeking a citation for contempt in the event of any violation of any portion of this order.

6. The Water Department of the City of Philadelphia shall, on or before the tenth (10th) day of each month, file with the court a detailed written report, signed by the Commissioner or Deputy Commissioner of the Water Department, setting forth all repairs, renovations and capital improvements to the Northeast Water Pollution Control Plant that have occurred during the reporting period together with a timetable for all planned future repairs, renovations and capital improvements that have caused or may reasonably be expected to cause any malodor or air pollution. Such report shall also set forth any malfunction, breakdown or testing of equipment occurring during the reporting period that has caused or may have caused any malodor or any air pollution and any and all actions taken to minimize such malodor or air pollution problem. A copy of such reports shall be provided to counsel for plaintiffs.

7. In the event of any chemical discharge or spill entering the Northeast Water Pollution Control Plant that creates a detectable malodor in the ambient air outside of any building at the Northeast Water Pollution Control Plant or causes or requires any building to be evacuated by employees, a similar investigation and report as required by paragraphs 3 and 4 of this order shall be made and filed. Investigation of any chemical discharge or spill causing a detectable malodor or an evacuation of any building shall seek to determine promptly the source and cause thereof and the City of Philadelphia shall take all reasonable measures to prevent reoccurrence from the same or any other source. The results of such investigation and the action taken shall be set forth in the report required to be filed by this order.

8. Any party may file a motion at any time for any alteration, modification, addition or change in this order, provided the parties first seek in good faith by conference with each other to agree and stipulate to the same.